PRUET PRODUCTION CO. and Pruet Oil Company, Plaintiffs-Appellees, Cross-Appellants,

v.

Roy G. AYLES, Defendant-Appellant, Cross-Appellee.

No. 84–4686.

United States Court of Appeals, Fifth Circuit.

March 17, 1986.

---

**37.** 772 F.2d 1537 (11th Cir.1985).

Cupit & Maxey, John L. Maxey, II, Jackson, Miss., for defendant-appellant, cross-appellee.

Jolly, Miller & Milam, Armin J. Moeller, Jr., W. Thomas Siler, Jr., Jackson, Miss., for plaintiffs-appellees, cross-appellants.

Before POLITZ, HIGGINBOTHAM and JONES, Circuit Judges.

EDITH HOLLAN JONES, Circuit Judge:

A terminated employee and his former employer appeal from adverse directed verdicts on their respective Title VII age discrimination and pendent state law breach of contract claims. For the reasons set forth below, we affirm the trial court's granting of both directed verdicts.

## FACTS AND PROCEDURAL BACKGROUND

Roy G. Ayles, who had both an accounting and a law degree, began working for Pruet family entities in 1970, when he was hired as the sole accountant for a predecessor company. He became controller and secretary-treasurer of the company, and re-

tained these offices when the present Pruet entities (hereinafter collectively the "company") were formed in 1978.[1] As secretary-treasurer and controller, Ayles was in charge of the accounting and division order departments and also performed most of the personnel functions. In addition to receiving an annual salary of $33,000 at the time of the suit, Ayles participated in a profit-sharing program, whereby he received 10 percent of company profits before taxes. A substantial portion of the company's profits was derived from a system, instituted by Ayles in 1974, of investing income from the well properties in short-term securities, and retaining the interest earned before the payments were disbursed to the interest holders. As the oil business boomed in the late 1970's, the company prospered, so that by 1980, Ayles's profit-sharing payment had risen dramatically to approximately $120,000.

The rapid growth, however, placed increasing strains on the company's accounting capabilities. The company turned to outside consultants who found the largely manual method of recordkeeping inadequate and recommended an integrated computer system. In November 1980, a 32-year old accountant with computer experience, Chuck Bridges, was interviewed by Ayles and hired to assist him in accounting. Within a few months, Ayles was devoting 80 percent of his time to division order work.

Problems with the accounting systems continued to mount, particularly around tax time in April. Ayles suffered a heart attack that month and underwent heart surgery. In early May, the partners, Chesley Pruet, and his two sons-in-law Ricky Calhoon and Randy James, decided to convert to an in-house computer system. A month later, Pruet, upon the advice of an outside consultant, decided to remove Ayles as controller and secretary-treasurer and place Bridges in charge of all accounting matters.

On June 17, 1981, Pruet, Calhoon and James met with Ayles and informed him of their decision. Ayles, who was then 56, was told that he could continue working as division order manager at his same salary until the end of the year, but that his profit-sharing plan would terminate effective June 30, 1981. Pruet offered to enter into an employment agreement with Ayles whereby he would receive $120,000 at the end of the year. In mid August, Ayles met again with the partners and asked point blank if he was being let go because of the profit-sharing plan. Both sides agree that Pruet emphatically denied that was the reason. The partners and outside counsel who were at the meeting testified that the change was prompted by their belief that Ayles would not be able to handle the change over to the proposed computer system and that this belief was communicated to Ayles. Ayles denies being told this, and testified that the only explanation ever given was a subsequent offhand comment by James about "changing times." Ayle's former assistant, Chuck Bridges, became controller on July 1, 1981, and James and Calhoon, then 31 and 28 years old respectively, took over Ayles's mostly *pro forma* duties as secretary-treasurer.

Throughout June, July and August, Ayles and the company's outside counsel negotiated the terms of the employment agreement, which was formally executed on August 31, 1981. The agreement provided that as of July 1, 1981, Ayles had relinquished his responsibilities as controller and secretary-treasurer "because of health conditions and work load" (an insertion Ayles had insisted on), and assumed the duties of division order manager. Ayles was to remain employed until December 31, 1981 at the same rate of compensation and fringe benefits, except the profit-sharing plan. The company agreed to pay Ayles $120,000 at the end of the year. The agreement also provided that

**1.** Pruet Oil Company engaged in oil and gas exploration; Pruet Production Company operated well properties, marketing the oil and gas produced, and after deducting each interest owner's proportionate share of expenses and appropriate state and federal taxes, disbursed to each interest owner the correct amount each month.

Ayles and the company would negotiate whether and under what conditions Ayles would continue employment after January 1, 1982. Subsequent discussions proved unsuccessful, however, and in November 1981, Ayles announced he would leave the company at the end of the year. The company thereupon hired Stan Kynerd, then 28, to replace Ayles as division order manager in early December.

Around December 22, 1981, the company asked that Ayles sign a release prior to his departure. Ayles requested that the company give him a release also. The parties disagree on whether Ayles ever agreed to sign the release. That afternoon, Ayles went to the local EEOC office and consulted a lawyer. When, on January 4, 1982, Ayles returned to pick up his severance pay, he refused to sign the release. The company, in turn, refused to give him the $120,000. Ayles contends that during this last encounter James finally explained his cryptic "changing times" remark by telling him the company wanted to restructure with younger people. James denies ever making this statement. Calhoon, who was also at the meeting, testified James never said it.

On January 21, 1982, Ayles filed an EEOC age discrimination charge against the company. While the charge was pending, the company brought a declaratory judgment action in federal district court, requesting declaration of the parties' rights under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (ADEA), as well as their rights under the employment agreement. Ayles responded with a counterclaim, alleging that the company had breached the employment agreement by failing to pay him his severance pay and had violated the ADEA by terminating him because of his age. When EEOC's unsuccessful conciliation attempts terminated, the parties proceeded with their civil suit.

The company moved to dismiss the age discrimination claim on the grounds that it was time-barred, because Ayles had not filed his charge with EEOC within the 180-day period mandated by 29 U.S.C. § 626(d)(1). Ayles responded that the time period should be equitably tolled because of the company's misleading him as to the reason for his being removed as controller. In pretrial proceedings, the district court denied a summary judgment motion filed by the company on the ground that Ayles's discrimination claim was time-barred, as he had not filed his charge with EEOC within the 180-day period mandated. Following a three-day jury trial, however, the court directed a verdict for the company on the equitable tolling issue and for Ayles on the breach of employment agreement claim. Each side appeals.[2]

## ANALYSIS

### 1. *Age Discrimination Claim*

■ Ayles initially contends that the trial court's denial of the company's motion for summary judgment precluded a directed verdict on the equitable tolling issue because the evidence that was presented to the jury was essentially the same as the evidence submitted at the pretrial hearing. This contention erroneously assumes that the standards for a summary judgment denial and for a directed verdict ruling are the same. *See Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (*en banc*). At the summary judgment stage, the court focusses on whether there exists a genuine issue of material fact; once the evidence is all in, the trial court is entitled to examine the actual proof and determine if the proof falls short of presenting a jury question. *Matthews v. Ashland Chemical, Inc.,* 770 F.2d 1303, 1307 (5th Cir.1985) (quoting *Nunez v. Superior Oil Co.,* 644 F.2d 534, 535 (5th Cir.1981)). *See also* 5A Moore's Federal Practice ¶ 50.03[4] (1985).[3]

---

**2.** Evidence was also submitted on the merits of the age discrimination claim. Because we affirm on the equitable tolling issue, we need not reach the additional findings by the district court on this claim.

**3.** We recently restated, in *Matthews v. Ashland Chemical,* that reversal of an improperly *granted* summary judgment does not preclude a directed verdict for the movant. 770 F.2d at 1307. *A fortiori,* the denial of a summary judgment

The standard, then, under which we assess the trial court's directed verdict on the equitable tolling issue is whether "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict...." *Boeing v. Shipman*, 411 F.2d at 374.

■ Ayles seeks, on equitable grounds, to modify the requirement of ADEA that before an aggrieved party can commence a civil action on an age discrimination claim he must file a charge with EEOC "within 180 days after the alleged unlawful practice occurred." 29 U.S.C. § 626(d)(1). The timely filing of a charge is not a jurisdictional requirement in the sense that failure to do so deprives the district court of subject matter jurisdiction, but is akin to a limitations statute which a plaintiff must satisfy as a condition precedent to filing suit. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); *Cruce v. Brazosport Ind. Sch. Dist.*, 703 F.2d 862, 863 (5th Cir.1983); *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584 (5th Cir.1981) (*en banc*). As with limitations statutes, the 180-day filing period is subject to tolling where equitable considerations are present. *Id.*

This court established the oft-cited test for equitable tolling in *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 930 (5th Cir.1975):

> [T]he statute does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights. A corollary of this principle, often found in cases where wrongful concealment of facts is alleged, is that a party responsible for such wrongful concealment is estopped from asserting the statute of limitations as a defense.

■ Because of the difficulty an employee typically faces in proving an employment discrimination claim, he need only

make a minimal showing in establishing a *prima facie* case. In an age discrimination suit, he must show that he was a member of the protected age group, that he was discharged, that he was replaced by a person outside the protected age group, and that he was qualified for the job. *Thornbrough v. Columbus and Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir.1985); *Price v. Maryland Cas. Co.*, 561 F.2d 609, 612 (5th Cir.1977). The showing required at the charge-filing stage is even more lenient. As the Seventh Circuit, in *Vaught v. R.R. Donnelley & Sons Co.*, 745 F.2d 407, 411–12 (7th Cir.1984), stated:

> The purpose of the charge "is only to initiate the EEOC investigation, not to state sufficient facts to make out a prima facie case" (citation omitted). As the Supreme Court noted recently, "a charge of employment discrimination is not the equivalent of a complaint initiating a lawsuit. The function of a Title VII charge, rather, is to place the EEOC on notice that someone ... believes that an employer had violated the title" (quoting *EEOC v. Shell Oil Co.* [466 U.S. 54], 104 S.Ct. 1621, 1630–31 [80 L.Ed.2d 41] (1984)).

■ The record contains ample evidence that, as of the June 17, 1981 meeting, Ayles was in possession of sufficient facts to support a *prima facie* claim of age discrimination, let alone a charge. At that time, Ayles was, at 56, within the protected age group, he was told he was being terminated and that he was being replaced by a person (Chuck Bridges) he knew to be outside the protected age group. Further Ayles's own testimony revealed his belief that he was qualified to remain as controller.

Ayles concedes that his January 21, 1982 filing with EEOC, when measured from the June 17, 1981 meeting at which he was asked to resign, was untimely. He argues, however, that the company misled him by concealing from him the "true" reason for his termination, i.e., his age, and maintains that the pattern of age discrimination did

(which redounds to the non-movant's benefit) cannot preclude a directed verdict.

not become evident until December 1981, when Kynerd was hired. It was not until then, he contends, that he realized that the company had filled his former positions with four younger persons. Ayles further testified that he was not aware of the existence of ADEA until he consulted the EEOC in December 1981, and he argues that the company by failing to post notices of employees' rights under ADEA, as required by 29 U.S.C. § 627, denied him any opportunity to become aware of his rights.

An employer's misrepresentations or wrongful concealment of facts necessary to support a discrimination charge have given rise to equitable estoppel where they prevented an employee from asserting his rights timely. In *Reeb,* for example, the terminated employee was falsely informed that her job had been terminated because of inadequate funds. In *Tucker v. United Parcel Service,* 657 F.2d 724, 725 (5th Cir. 1981), although all seasonal employees were told they would not be recalled, the company recalled almost exclusively white and not black seasonal workers. In each of these instances, the filing period was held tolled until the time when the employee became aware of the facts necessary to support a discrimination charge. *See also Meyer v. Riegel Prod. Corp.,* 720 F.2d 303, 305 (3d Cir.1983), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984) (employer misrepresenting to employee that his dismissal resulted from reorganization while secretly hiring a younger replacement).

Here, by contrast, Ayles can point to no misrepresentation or concealment that actively lulled him into missing the filing deadline. The partners specifically told him that they believed he was incapable of handling the changeover to the in-house computer system; he steadfastly maintained he was qualified to do so. His belief that he was being discharged because of his participation in the profit-sharing plan resulted from a mistaken perception on his part, and not misconduct by the company. When he confronted Pruet with this accusation, Pruet denied it. Moreover, the profit-sharing agreement itself was termin-

able at the will of the company. The evidence also showed that the company was receptive to Ayles's request to remain as division order manager, repeatedly sought to persuade him to do so and offered him a pay increase if he did stay. Only after he had announced his decision to leave and could not be persuaded otherwise, did the company set about hiring Kynerd as his replacement. The trial court properly concluded that the company's actions did not mislead Ayles.

■ With regard to the absence of ADEA information posters, we have previously held that mere failure to post notices is not sufficient by itself to support equitable tolling when the employee has the means to learn of the existence of his Title VII rights. *See Cruce,* 703 F.2d at 864. As the person who admittedly performed most of the personnel duties in the company, Ayles was ideally placed to obtain the appropriate information. Moreover, as an attorney, Ayles is charged with knowledge of the law, even though he may have had no experience in equal employment law. *See Quina v. Owens-Corning Fiberglas Corp.,* 575 F.2d 1115, 1118 (5th Cir.1978); *Edwards v. Kaiser Aluminum & Chem. Sales, Inc.,* 515 F.2d 1195, 1200 n. 8 (5th Cir.1975); *Downey v. Firestone Tire & Rubber Co.,* 35 F.E.P. 30 (D.D.C.1984), *aff'd in pertinent part,* 37 F.E.P. 1072 (D.C.Cir.1985). The trial court properly directed a verdict in the company's favor on the equitable tolling claim.

### 2. *Breach of Contract Claim*

The company challenges the adverse directed verdict on its pendent state law claim that Ayles materially breached the employment contract by failing to comply with terms of the agreement which required him (1) to perform his duties in a good workmanlike manner and (2) not to divulge confidential information, as well as (3) by failing to sign a release upon tender to him of the $120,000 severance pay. Again, we apply the *Boeing v. Shipman*

standard to determine if there was sufficient evidence to raise a jury question.

The trial court labelled the company's assertion that Ayles failed to perform his division order manager work during the July-December period in "a careful, diligent, workmanlike manner" as bordering on the frivolous. We agree. There was conflicting testimony as to whether Ayles made derogatory remarks about his employers during this time. However, as the trial court correctly ruled, any such remarks obviously did not affect his performance, because the company actively sought to persuade Ayles to remain, even up to the day Kynerd was hired as his replacement.

Paragraph V of the employment agreement provides in pertinent part:

Employee agrees that any and all information directly or indirectly pertaining to the past, present and future operations of [Pruet entities] is deemed to be confidential and Employee agrees to maintain such information confidential and not disclose any such information without the consent of one of the general partners of Pruet Oil Company. It is understood by Employee and Employer that any information generally known to the general public is not considered confidential. Any breach of the provisions of this Paragraph ... by Employee shall be deemed to be a material breach of this agreement entitling Employer to all rights and remedies for a material breach of contract.

The only evidence produced by the company regarding improper disclosure of confidential information concerned Ayles's revealing details about his erstwhile participation in the company profit-sharing plan to the new division order manager Kynerd. In an argument that is at best strained, especially in the absence of any supporting evidence, the company contends that this revelation constituted a material breach of the provision because such information was not generally known to the public and because compensation arrangements between an employer and employee are regarded as confidential matters, even within a compa-

ny. The trial court properly rejected this interpretation, holding that the provision was intended to protect information dealing with oil properties and prospects, including engineering and geological data, leasing areas and title problems. Ayles so testified. None of the company's witnesses contested this interpretation, or offered any indication that the parties intended otherwise. In fact, the only company witness to testify on the issue, Calhoon, agreed that the oil and gas industry was preoccupied with protecting its geological and leasing data.

The company's final contract contention, that Ayles breached the employment agreement by failing to sign the release, suffers from a fatal inconsistency. Mississippi law supports the company's position that a written contract can be modified by an oral agreement. *See Hensley v. E.R. Carpenter Co., Inc.,* 633 F.2d 1106, 1108 n. 2 (5th Cir.1980); *St. Louis Fire & Marine Ins. Co. v. Lewis,* 230 So.2d 580, 582 (Miss.1970). However, if, as the company asserts, Ayles entered into a valid oral modification of the employment contract, then his mere failure to sign a written version of that modification cannot constitute a breach. On the other hand, if the modification had to be written to be effective, then in refusing to sign a written release, Ayles did not agree to it, and there was nothing to be enforced.

The employment agreement itself contains no release provision. The trial court properly found that the agreement is not ambiguous on its face. The company's allegations that it was executed as a result of mutual mistake, or that the agreement impliedly contained a release provision, is refuted by overwhelming evidence in the record that the agreement was drafted by two lawyers, who negotiated and renegotiated the terms over a three-month period. The trial court correctly directed a verdict in favor of Ayles on the pendent state law breach of contract claim.

AFFIRMED.